IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF DONAMICK B.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF DONAMICK B., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

DONAMICK B., APPELLANT.


Filed May 31, 2016.    No. A-15-886.


Appeal from the Separate Juvenile Court of Lancaster County: REGGIE L. RYDER, Judge. Affirmed.

Joseph Nigro, Lancaster County Public Defender, and Sarah J. Safarik for appellant.

Joe Kelly, Lancaster County Attorney, and Lory A. Pasold for appellee.


MOORE, Chief Judge, and INBODY and RIEDMANN, Judges.

MOORE, Chief Judge.

## INTRODUCTION

Donamick B. appeals from an order of the separate juvenile court of Lancaster County adjudicating him as a child within the meaning of Neb. Rev. Stat. § 43-247(1). The adjudication was based upon two counts of third degree sexual assault in violation of Neb. Rev. Stat. § 28-320. Upon our de novo review, we affirm the juvenile court's order.

## BACKGROUND

On June 11, 2015, Donamick (age 13) was charged by petition in the separate juvenile court of Lancaster County with two counts of third degree sexual assault (incompetent), both in violation of Neb. Rev. Stat. § 28-320(1) (Reissue 2008). These charges arose from Donamick's

- 1 -

actions towards his younger sister, B.B. (age 12), and younger brother, L.B. (age 10). Both counts alleged that Donamick subjected each respective sibling to sexual contact without consent of the sibling or when he knew or should have known that the sibling was physically or mentally incapable of resisting or appraising the nature of his or her conduct. The petition also included a charge for theft by shoplifting, $0-$200. However, the shoplifting charge was continued for good cause at trial upon the oral motion of defense counsel, and is not at issue on the current appeal.

By reason of these charges, the petition alleged that Donamick is a juvenile as defined by Neb. Rev. Stat. § 43-247(1) (Cum. Supp. 2014). On July 22, 2015, Donamick entered a denial and the court ordered a formal adjudication hearing.

On August 24, 2015, an adjudication hearing was held. B.B. and Donna P., the three children's grandmother and legal guardian at the time of the offenses, testified for the State. L.B., whom Donna described as being developmentally delayed in certain areas and autistic, did not testify. Donamick testified on his own behalf. The only exhibit at trial was a photocopy of a girl with no clothes on used by B.B. to describe where Donamick touched her.

Donamick, B.B., L.B., and Donna all moved from North Platte, Nebraska to Lincoln, Nebraska around February 2015. After residing in temporary housing for a period of time, the four of them moved into an apartment in Lincoln.

B.B. testified regarding actions allegedly committed by Donamick against herself and L.B. She claimed that while living in the Lincoln apartment, Donamick subjected her to unwanted touching of her private parts on multiple occasions. Donamick purportedly would grab B.B.'s breast with his hand and twist it. B.B. described this action as a "titty twister," claiming that Donamick did this on more than one occasion. She would tell Donamick to stop and try to get away from him when these incidents occurred.

B.B. also claimed that Donamick would try to touch her vagina using his hand. B.B. testified that the touching occurred over her clothes and that Donamick would "go up and down" with his hand. B.B. would tell him to stop, to which Donamick would sometimes comply. B.B. was on occasion able to push Donamick away. B.B. never screamed or spoke to Donamick about this when it was happening. During cross-examination, B.B. testified that Donamick did not touch the inside of her vagina or a part of her body that was covered by underwear. B.B. also marked on the drawing of a girl where Donamick allegedly touched her, specifically her breasts and vagina.

B.B. stated that there were no witnesses to these events. She was unsure how many times this occurred or the location of such incidents in the apartment. B.B. was also unable to recall the dates when these incidents transpired.

B.B. also testified regarding Donamick's alleged assault of L.B. On this occasion, B.B. entered the boys' shared bedroom to tell them it was time for their evening medications. After knocking on and opening the closed bedroom door, B.B. observed L.B. laying stomach down on Donamick's bed, with Donamick on top of L.B. trying to hold him down. B.B. witnessed Donamick "humping" L.B., which she described as "going up and down." L.B. was attempting to get away from Donamick. B.B. described both boys as wearing clothes during the incident, but stated that their penises and buttocks were visible and uncovered by clothing. She testified that upon walking into the room, Donamick got off of L.B. and the boys said nothing and were quiet. However, on cross-examination, B.B. stated that L.B. was screaming at Donamick to get off him

when she entered the bedroom. She was uncertain of the date of this incident, but believed that it occurred around the time of day when the boys were supposed to take their evening medication. B.B. proceeded to the kitchen where Donna was talking on the phone. After Donna finished the phone call, B.B. told her what she had just observed.

B.B. also provided some general testimony regarding family dynamics. B.B. stated that while living with Donna, she told people that she would prefer to live with her father. Donamick and B.B. would sometimes fight, say mean things to each other, and Donamick would make fun of her. She testified that Donamick has pushed her before, but denied doing the same to him. B.B. stated that sometimes it would be nice if she did not have to live with Donamick. She expected that Donamick would "get taken away" once she disclosed the allegations to a counselor at the Child Guidance Center.

Donna and her grandchildren have almost always lived together. The children were removed from Donna's custody in May 2015. Donna recalled that B.B. spoke with her regarding the incident between Donamick and L.B., but Donna was unable to remember specifically when the exchange occurred. After this conversation, Donna found the boys "hiding" in their bedroom and that a top mattress was removed from a bed. However, she claims that the boys had previously done this to create a "tent" or simulate a camping environment. Donna observed that both boys were wearing underwear only. However, she testified on cross-examination that it was not uncommon for the boys to be in their underwear at the apartment. She never discussed B.B.'s report with Donamick.

Donna also testified regarding the children's tendencies and interactions. She had seen Donamick fight with both L.B. and B.B. individually, as well as the three children scuffle together. Donna described the fights as involving hitting and pushing. She also recalled occasions when the children would jump back and forth between Donamick and L.B.'s beds, during which they would knock into each other.

The State rested following Donna's testimony. Donamick's attorney made a motion to dismiss for failure to prove a prima facia case, focusing on B.B. and Donna's uncertainty regarding the timing of the alleged assaults and circumstances surrounding Donamick's actions against B.B. The court overruled the motion.

Donamick proceeded to testify in his own defense, denying the allegations brought against him and arguing that any inappropriate touching of B.B. or L.B.'s private parts was not intentional. He testified to wrestling, pushing, and arguing with B.B. and L.B., who would act likewise towards him. Donamick defined wrestling as tripping and trying to pin a sibling to the ground, not physically hurting each other. Donamick and B.B. would call each other names.

Donamick also described an activity L.B., B.B. and himself would play in the boy's bedroom while living in Lincoln called the "sinking islands game." The game involved jumping from bed to bed as if they were sinking, using one's imagination to avoid being on the bed that sinks. During the game, the children would bump into each other, and at times a sibling would land on Donamick. Donamick stated that they would play the game four to five times a week. Upon hearing the noise, Donna would tell them to quit. On occasion, Donna would watch them play the game. Donamick did not recall an instance where he intentionally or accidently touched B.B.'s vagina while playing this game, stating that if such an act ever occurred it would have been

accidental. Further, Donamick testified that if he had touched B.B.'s vagina, he would have removed his hand immediately. During cross-examination, B.B. testified to being unfamiliar with the "sinking islands game," and denied ever jumping on the bed with Donamick.

Donamick also testified that the children would play tackle football in the front yard while living in Lincoln, during which time the siblings would knock into and tackle each other. He denied ever intentionally touching B.B.'s vagina while playing football, and stated that any such contact would have been accidental. Donamick also denied ever intentionally touching B.B.'s vagina while giving her a piggy back ride, an activity he claims they did when she was younger. B.B. stated that Donamick did not give her piggy back rides.

Donamick testified regarding his and L.B.'s sleeping arrangements. He explained that they would share a bed sometimes. Donamick claims his brother would occasionally get scared at night and sleep in either his bed or Donna's bed. He clarified that the brothers were never naked while sharing a bed. Specifically, Donamick would wear underwear and shorts and L.B. would wear underwear.

Donamick was asked if he recalled a time when Donna entered the boy's bedroom while he and L.B. were in their underwear and building a fort. He did remember such an occasion, and claimed they had made forts "plenty of times." Donamick also provided testimony indicating that it was not unusual for L.B. and himself to be in their underwear at the apartment.

Regarding the allegations of sexual assault, Donamick testified that he never intentionally touched B.B. or L.B.'s private parts, knew his sister did not want him to touch her private parts, and understood it would be inappropriate to touch his brother's private parts. Donamick stated that he never intentionally touched B.B.'s vagina with his hand or intentionally grabbed her breasts. He indicated that if his hand ever landed on her vagina it was accidental and not intentional. Donamick also testified that he never gave B.B. "titty twisters." Rather, he claims that L.B. would give him and B.B. "titty twisters." Donamick testified that B.B. would give him and L.B. "titty twisters" as well. Lastly, Donamick denied "humping" L.B. as B.B. described during her testimony.

After considering the evidence presented and arguments of counsel, the court found that the result would "come down to really an issue of credibility" because both stories presented at trial could not be true. With this regard, the court was "convinced of the credibility of B.B." based on its observations of her testimony, reactions, and demeanor.

Additionally, the court found that while there were no direct eye witnesses to the incident between Donamick and L.B., there was some corroborating evidence. Specifically, the court noted Donna's testimony that she remembered B.B. talking to her about the incident and going into the bedroom where she observed the boys hiding. The court also questioned how, if Donamick built forts all the time, he was able to remember on this particular occasion that Donna entered the bedroom while he was in his underwear following B.B.'s report. The court questioned how that could stand out in Donamick's mind when this is an activity (i.e., building forts) that he commonly does.

Furthermore, the court noted that B.B. "provided a lot of details, specifics in terms of what happened to her, what happened to her brothers (sic), what she observed," and that such words were not planted in her head. Rather, the court felt such testimony was provided on her own, and

that at her young age, the court was "very convinced by her specifics" and testimony that the allegations did in fact occur.

The court went on to find that the allegations supporting both counts of third degree sexual assault were proven true beyond a reasonable doubt. Accordingly, the court adjudicated Donamick as a child within the meaning of Neb. Rev. Stat. § 43-247(1) and set the matter for dispositional hearing.

Donamick subsequently perfected this appeal.

## ASSIGNMENTS OF ERROR

Donamick assigns that the evidence presented at the adjudication hearing was insufficient to sustain an order of adjudication of jurisdiction under Neb. Rev. Stat. § 43-247(1).

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Cassandra B. & Moira B.*, 290 Neb. 619, 861 N.W.2d 398 (2015). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

## ANALYSIS

Pursuant to Neb. Rev. Stat. § 43-279(2) (Cum. Supp. 2014), when an adjudication is based upon § 43-247(1), the allegations must be proved beyond a reasonable doubt. *In re Interest of Kyle O.*, 14 Neb. App. 61, 703 N.W.2d 909 (2005).

The State sought adjudication on the basis that Donamick committed sexual assault. Neb. Rev. Stat. § 28-320(1) states the following:

> Any person who subjects another person to sexual contact (a) without consent of the victim, or (b) who knew or should have known that the victim was physically or mentally incapable of resisting or appraising the nature of his or her conduct is guilty of sexual assault in either the second degree or third degree.

Because the State does not assert that Donamick caused serious personal injury to B.B. or L.B., the alleged sexual assault in the instant case would be in the third degree and a Class I misdemeanor. Neb. Rev. Stat. 28-320(3) (Reissue 2008).

Neb. Rev. Stat. § 28-318(8) (Cum. Supp. 2014) defines "without consent," in relevant part, as follows:

> (a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct . . .
>
> (b) The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent; and

(c) A victim need not resist verbally or physically where it would be useless or futile to do so . . .

Neb. Rev. Stat. § 28-318(5) (Cum. Supp. 2014) defines "sexual contact," in relevant part, as follows:

Sexual contact means the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. . . . Sexual contact shall include only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party.

"In proving sexual contact . . . the State need not prove sexual arousal or gratification, but only circumstances and conduct which could be construed as being for such a purpose." *State v. Osborn*, 241 Neb. 424, 433, 490 N.W.2d 160, 167 (1992). See, also, *Kyle O.*, *supra*. Although a perpetrator's state of mind is a question of fact, such fact may be proved by circumstantial evidence. *In re Interest of Jeffrey K.*, 273 Neb. 239, 728 N.W.2d 606 (2007).

This court in *Kyle O.* discussed the issue of inferring sexual gratification when the actor is a child rather than an adult. We determined that no bright-line rule should be applied regarding the age of the child actor, but rather, whether intent can be inferred depends heavily upon the particular circumstances of each case. *Kyle O., supra*.

Donamick asserts on appeal that the record demonstrates that the alleged incidents were merely "sibling disputes" and "rough housing." He claims that any touching of intimate body parts that occurred during "a children's game or a sibling fight" was accidental and not for the purpose of sexual gratification. Donamick also claims that B.B.'s testimony was vague and inconsistent, unreliable due to her young age, and was influenced by her bias against Donamick. Further, he emphasized that Donna did not testify to having observed any sexual misconduct, only seeing the boys taking part in normal behavior.

Donamick relies heavily on our opinion in *Kyle O.* to support his claim that insufficient evidence existed to infer that any contact between him and his siblings was for the purpose of sexual gratification. In that case, Kyle (age 14) pulled down the pants of a 5-year-old, grabbed the child's penis, and held it to show the other children present how small it was. This action lasted approximately 2 seconds. An adult witness "hollered" at Kyle, who turned away and folded his arms in an effort to appear that he had done nothing. The adult then told the children to go home, and the 5-year-old pulled his own pants up. *In re Interest of Kyle O.*, 14 Neb. App. 61, 62-63, 703 N.W.2d 909, 911-912 (2005).

This court in *Kyle O.* found insufficient evidence to support the adjudication. Because there was no evidence that Kyle was sexually aroused, we were left looking to the circumstantial evidence in an attempt to glean Kyle's intent. We found it significant that the incident occurred "outside during the daytime, in the presence of others, and lasted approximately 2 seconds." Further, Kyle's response was an attempt to avoid scrutiny for actions that were "wrong on a more basic level" rather than evidence that his conduct was for the purpose of sexual gratification. Lastly, we noted that "it would be very easy to construe Kyle's conduct as being for the purpose

of humiliating, bullying, or annoying" the child, and while some jurisdictions include such actions within their definition of sexual contact, Nebraska has not. *In re Interest of Kyle O.*, 14 Neb. App. 61, 72-73, 703 N.W.2d 909, 917-918 (2005). Donamick claims that his actions similarly were designed to merely bully and humiliate, not for the purpose of sexual arousal or gratification. We note that the statutory definition of "sexual contact" has not changed to include such language since the publishing of our opinion in *Kyle O.*

The facts in the present case are distinguishable from *Kyle O.* While our record likewise contains no direct evidence that Donamick was sexually aroused, the circumstantial evidence supports an inference that the intent of Donamick's actions was for purposes of sexual gratification. With regard to Donamick's conduct with B.B., the record shows that Donamick touched B.B.'s vagina (on the outside of her clothing) on multiple occasions using an "up and down" motion. These instances occurred when no one else was present. With regard to L.B., the record shows that Donamick was on top of L.B., who was lying face down on the bed, and Donamick was "humping" L.B. The boys either had their clothing or underwear on, however, their penises and buttocks were exposed. Thus, the nature of the contact in this case was far more sexually suggestive than in *Kyle O.* In addition, the contact between Donamick and B.B. occurred on more than one occasion.

Although Donamick provided an alternative explanation of the contact between him and his siblings and attacked the credibility of B.B.'s testimony, we give weight to the fact that the lower court observed the testimony of both B.B. and Donamick, and specifically found that B.B.'s testimony was more credible. We can find no error in the trial court's determination in this regard. Although B.B. was unable to give precise testimony regarding the date and location of each assault by Donamick, B.B.'s testimony about the occurrences was sufficiently specific and deliberate to support her credibility. And, although the testimony of a person who is a victim of a sexual assault does not require corroboration, see Neb. Rev. Stat. § 29-2027 (Reissue 2008), we note that Donna's testimony at least supported B.B.'s reporting of what she observed of the contact between Donamick and L.B.

Upon our de novo review, we find that Donamick's actions against B.B. and L.B. could reasonably be construed to be for the purpose of sexual arousal or gratification, and therefore the State satisfied its burden of proving the elements of these offenses beyond a reasonable doubt. Although Donamick does not argue that B.B. and L.B. consented to the sexual contact, for the sake of completeness, we find that B.B. and L.B.'s efforts to avoid the sexual contact demonstrates that Donamick's actions were done without the consent of the victims.

Because the State satisfied its burden of proving the offenses against Donamick, the juvenile court did not err in adjudicating him. Donamick's assignment of error is without merit.

## CONCLUSION

Upon our de novo review, we conclude that the juvenile court did not err when it determined the State had proven, beyond a reasonable doubt, the allegations of the two counts of third degree sexual assault and in finding that Donamick came within the meaning of Neb. Rev. Stat. § 43-247(1). We therefore affirm.

AFFIRMED.